# In the United States Court of Federal Claims

No. 24-698

Filed: November 19, 2024[†]

Published: December 4, 2024

---

LEGACY CORPORATION OF
ILLINOIS,

                *Plaintiff,*

v.

THE UNITED STATES,

                *Defendant,*

*and*

DUBUQUE BARGE AND FLEETING
SERVICE COMPANY, d/b/a NEWT
MARINE SERVICE,

                *Intervenor-Defendant.*

---

*Theodore Watson*, with *Wojciech Z. Kornacki*, Watson & Associates LLC, Aurora, CO, for Plaintiff.

*Margaret J. Jantzen*, Senior Trial Counsel, and *Nelson Kuan*, Trial Attorney, with *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

*Erin R. Davis*, with *Peter Deegan*, and *Brandon E. Dobyns*, Taft Stettinius & Hollister, Dayton, OH, for Intervenor-Defendant.

---

[†] This Order was originally filed under seal on November 19, 2024, (ECF No. 53). The Court provided parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions. The proposed redactions were filed on December 3, 2024, (ECF No. 55), and are accepted by the Court. Thus, the sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

This post award bid protest considers whether the Department of the Army Corps of Engineers ("USACE") erred when it did not consider Legacy Corporation of Illinois' ("Legacy") offer after Legacy failed to obtain a certificate of competency ("COC"). Legacy challenges the United States' decision on various grounds, ultimately arguing that USACE's decision was arbitrary, capricious, contrary to the evidence, accomplished in bad faith, and violates the FAR. Legacy claims that these errors resulted in a violation of its due process rights.

The Court determines that both the USACE and the Small Business Administration ("SBA") exercised appropriate discretion. Accordingly, the Court denies Legacy's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 29), and grants the United States' and Intervenor Newt Marine Service's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 33; Int.-Def.'s xMJAR, ECF No. 32). During briefing the United States moved for an extension of time to file its Motion for Judgment on the Administrative Record. (ECF No. 31). That request is denied as moot. Further, the United States moved to amend or correct the record to correct Tab 19b. (ECF No. 37). That motion is granted. Lastly, the United States submitted, without seeking leave, declarations seeking to explain inconsistencies existing between two versions of documents appearing within the administrative record. The Clerk is ordered to strike Exhibits 1 and 2 which are attached to the United States' Cross Motion and Response, (ECF No. 33).

IMAGE OF STEAMBOAT ISLAND

### I.    Background

This procurement involves a small business set-aside construction contract for habitat restoration services at Steamboat Island, which sits between Scotts County, Iowa and Rock Island County, Illinois, in the Mississippi River, in the Mississippi River basin. (Administrative Record ("AR") at 6, ECF No. 41).[1] The

---

[1] Image of Steamboat Island. Rock Island District, US Army Corps of Engineers, *Steamboat Island HREP*, https://www.mvr.usace.army.mil/Media/Images/igphoto/2002295736/ (last visited Oct. 3, 2024).

solicitation[2] summarized the work as including "surveying, clearing, excavating/mechanical dredging and placing; transferring and shaping of placed material into topographic diversity sites; seeding and [s]ite [r]estoration" with an estimated price range of $5 to $10 million. (AR 40, 129). The solicitation stated that the work was to be completed in 569 days and would be awarded to a responsible bidder who conformed with the solicitation and was most advantageous to the United States considering only price and price-related factors. (AR 45, 52). In response to the solicitation, Legacy Corporation, Newt Marine Service, and Bloomsdale Excavating Co., submitted proposals. (AR 494–95). In relevant part, the offerors proposed the following prices:

| Bidder | Price |
|---|---|
| **Bloomsdale Excavating Co.** | ███████████ |
| **Newt Marine Service** | $5,344,356.00 |
| **Legacy Corporation** | $5,143,500.00 |

(AR 495).

Subsequently, USACE performed a responsibility review of Legacy. (AR 495, 505–08). A responsibility determination is a term of art, it means simply that the agency determines whether a proposed contractor has the ability to complete a contract. *See* FAR 9.104-1 (listing standards for a prospective contractor to qualify as "responsible"); FAR 19.602-1(a), (b) (upon determining and documenting that an apparent successful small business offeror lacks certain elements of responsibility, the contracting officer shall refer the matter to the SBA). Here, the CO reviewed Legacy's Contractor Performance Assessment Reports ("CPARS") on previous contracts and drafted a non-responsibility memo highlighting two ███████ past performance schedule ratings and three ██████ past performance schedule ratings. (AR 506). Additionally, the CO noted that the United States sought to terminate Legacy for default after issuing both a cure and show cause notice on an ongoing dredging contract.[3] (AR 505). The CO determined that Legacy was not responsible within the definition of FAR 9.104 and thus ineligible for the award. (AR 508). The CO subsequently submitted a COC application to the SBA. (AR 619–1180).

The SBA notified Legacy of the CO's referral and Legacy responded to the non-responsibility determination. (AR 1197, 1228–376). Legacy specifically objected to the inclusion of information regarding the ongoing dredging contract and interim CPARS from 2016–2017. (AR 1248–56). The SBA's industrial specialist ("IS") reviewed USACE's referral package and Legacy's application materials. (AR 1618–625). The IS found that Legacy "had issues with quality control, scheduling and management, causing delays and unnecessary additional

---

[2] Solicitation No. W912EK24B0013.

[3] Contract no. W912EK21D0008. (AR 509–10, 629–31 (The United States sought termination because it believed that Legacy failed to adhere to the schedule of performance and suffered multiple equipment breakdowns that delayed completion)).

oversight of past projects." (AR 1625). Despite this finding, the IS recommended issuing a COC as "[Legacy's] apparent sincere efforts to take corrective action in-house" led the IS to believe Legacy maintained "the capacity to perform acceptably . . . and will not be detrimental to the Government or significantly increase the risk for unsuccessful performance." (AR 1625).

A three-member COC Review Committee ("the Committee") considered Legacy's COC application, the CO's non-responsibility determination, and the IS's Report and Recommendation. (AR 1626–27). The Committee recommended, by simple majority vote, that Legacy be denied a COC for "not sufficiently overcoming the CO's objections." (AR 1627). The Committee forwarded its recommendation to the Area Director who, after reviewing the package, finally denied Legacy a COC for "fail[ing] to overcome the reasons cited for referral." (AR 1632). In plain terms, the SBA determined that Legacy was not capable of fulfilling the proposed contract for rehabilitation of the Steamboat Island project.

As a consequence, USACE awarded the contract to Newt Marine as the second-lowest bidder and next in-line for award. (AR 1642–43). This litigation ensued. The parties now move for judgment on the administrative record.

## II.    Analysis

When deciding a bid protest, the Court "appl[ies] the appropriate [Administrative Procedure Act ("APA")] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Under the APA, the Court determines whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). In other words, the Court must determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009).

To determine whether the agency's decision was arbitrary or capricious, the Court determines whether the action was "legally permissible, reasonable, and supported by the facts." *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 551 (2017). The Court may not substitute its own judgment for that of the agency. *Id.* Rather, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government" particularly in the "minutiae of the procurement process[.]" *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). This standard is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). But if the agency's decision fails under this standard, the Court determines if the "bid protester was prejudiced by that conduct." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). To establish prejudice, the plaintiff must show "that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors." *Id.* at 1353.

When parties move for judgment on the administrative record, RCFC 52.1 provides a procedure to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Id.* at 1356. Genuine issues of material fact do not preclude judgment on the

administrative record, so the Court can resolve questions of fact by referencing the administrative record. *Id.* at 1355–56. Because the Court is bound to the administrative record, it "will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated." *ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 764 (2022) (quoting *IAP Worldwide Servs. v. United States*, 159 Fed. Cl. 265, 286 (2022)). It follows that the Court is suspect of "any rationale that departs from the rationale provided at the time the procuring agency made its decision." *Sys. Stud. & Simulation, Inc. v. United States*, 152 Fed. Cl. 20, 32 (2020) (quoting *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 158 (2015), *aff'd* 809 F.3d 590 (Fed. Cir. 2015)).

"Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision." *Sims v. United States*, 655 Fed. Appx. 826, 829 (2016) (quoting *John C. Grimberg Co., Inc. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999)); *see also Supreme Foodservice GmbH v. United States*, 112 Fed. Cl. 402, 415 (2013) (citing *News Printing Co. v. United States*, 46 Fed. Cl. 740, 746 (2000)) ("'A contracting agency has broad discretion in making responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance.'") (quotation and citation omitted). "When such decisions have a rational basis and are supported by the record, they will be upheld." *Supreme Foodservice GmbH*, 112 Fed. Cl. at 415 (citing *Bender Shipbuilding & Repair Co., Inc. v. United States*, 297 F.3d 1358, 1362 (2002)). An agency's responsibility determination is entitled to a "presumption of regularity," and a plaintiff "necessarily bears a heavy burden" in seeking to rebut that presumption. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001).

It is settled that "this court has jurisdiction to review the SBA's denial of the plaintiff's application for a COC pursuant to the court's jurisdiction over bid protests." *CSE Constr. Co., Inc. v. United States*, 58 Fed. Cl. 230, 247 (2003); *see Cavalier Clothes, Inc. v. United States*, 810 F.2d 1108, 111 (Fed. Cir. 1987) ("The mere fact that [15 U.S.C. § 637(b)(7)(A)] commits the 'final disposition' of the competency certification to the SBA does not immunize from judicial review the refusal to grant a COC."); *Stapp Towing Inc. v. United States*, 34 Fed. Cl. 300, 306 (1995) ("Unquestionably, the Court of Federal Claims has jurisdiction to review the COC determination."). The Court applies the same "arbitrary and capricious" standard utilized in agency procurement actions when reviewing the SBA's competency determinations, *CSE Constr. Co.*, 58 Fed. Cl. at 248, although "certain deference must be accorded the unique expertise that [the] SBA [ ] unquestionably possesses in the area of business responsibility determinations[.]" *United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 30–31 (2006) (quoting *Stapp Towing*, 34 Fed. Cl. at 306). "[T]his court will overturn an SBA competency determination only if it appears by a preponderance of the evidence 'that the SBA's COC decision of nonresponsibility had no rational basis or that, in making the decision, the SBA violated an applicable procurement statute or regulation in a manner prejudicial to the protesting bidder.'" *CSE Constr. Co.*, 58 Fed. Cl. at 248 (quoting *Stapp Towing*, 34 Fed. Cl. at 306).

Legacy challenges both USACE's referral decision and SBA's evaluations and denial of a COC as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. (*See generally* Pl.'s MJAR). First, Legacy argues the CO's determination of non-responsibility was accomplished in bad faith. (*Id.* at 12–28). Specifically, Legacy argues USACE improperly introduced information, on which the SBA relied, regarding a termination for default

and performance of schedule concerns that were not officially documented in CPARS. (*Id.*). Second, Legacy argues USACE violated statutory CPARS requirements and Legacy's due process rights by considering seven (7) year old performance reports and not permitting Legacy time to respond. (*Id.* at 28–29). Third, Legacy argues USACE's COC referral to the SBA was arbitrary and capricious because it omitted vital information. (*Id.* at 29–30). Fourth, Legacy argues USACE treated the offerors unequally by not following the solicitation requirements when evaluating Legacy. (*Id.* at 30–31). Fifth, Legacy argues the SBA failed to follow its own regulations because it failed to ensure the evidence used to make a non-responsibility determination was substantial and more than mere suspicions and allegations. (*Id.* at 32–34). Finally, Legacy argues the SBA failed to follow FAR 9.104-3 when it failed to meaningfully consider the CO's COC request and Legacy's responses to the request. (*Id.* at 35). The Court respectfully disagrees.

    *A.    USACE acted in good faith.*

    Legacy argues the Army's non-responsibility determination was arbitrary, capricious, contrary to evidence, and accomplished in bad faith. (Pl.'s MJAR at 12–28). The CO reviewed Legacy's performance ratings on previous contracts and referenced Legacy's progress in ongoing contracts. (AR 505–08). The memo evaluated Legacy pursuant to the responsibility criteria provided under FAR 9.104-1. (AR 505). To be found responsible, a contractor must "[b]e able to comply with the required or proposed delivery or performance schedule . . . consider[ing] all existing commercial and government business commitments" and "[h]ave a satisfactory performance record." FAR 9.104(b–c).

    The CO highlighted several ███████ with Legacy's ability to comply with performance schedules. (AR 505–06). Out of fourteen previously awarded contracts, Legacy received two ███████ and three ███████ ratings.[4] (AR 506). Additionally, the memo specifically highlights contract no. W912EK21D0008 ("the ongoing contract"), a dredging contract, in which the CO's review found "issues with [Legacy's] ability to adhere to the schedule and for management to direct the contract to completion." (AR 505). Under the ongoing contract, Legacy received a cure notice[5] and show cause letter[6] from the United States pertaining to Legacy's failure to adhere to the schedule. (*See* AR 509–13). Legacy responded to

---

[4] Legacy received two ███████ schedule ratings (contract nos. W912EK16C0028; W912EK21D0003) and three ███████ schedule ratings contract nos. (W912EK19C0032; W912EK21D0002; W912EK21D0003). (AR 506).

[5] Legacy received a cure notice on Task Order W912EK23F0042 for unacceptable performance resulting in a forty-calendar day delay. (AR 511–13 (Cure Notice (August 24, 2023))).

[6] The United States issued a show cause order for Task Orders W912EK23F0071 and W912EK23F0074 finding that Legacy had ████████████████████, meet the dredge production rates, and correct issues raised in the August 24, 2023 cure notice. (AR 509–10 (Show Cause Letter (October 25, 2023))). The United States expressed it was considering termination of the contract for default. (*Id.*).

the cure notice citing difficulty with equipment failures and the type of dredge material, specifically asserting the delays were caused by unforeseeable incidents, and setting out the corrective actions Legacy took to mitigate delays. (AR 514–18).

Noting that "72.6%" of the overall contract consisted of similar dredging work, the CO was concerned with Legacy's ability to comply with the scheduling, stating:

> I have serious concerns about the contractor maintaining schedule because the contractor has **failed to correct performance delays** after numerous requests and a Show Cause Letter. Furthermore, as detailed below, **Legacy has had similar issues maintaining schedule on other contracts**. Legacy has failed on multiple occasion **on similar work to adhere to the schedule**. Based on this information, I question the contractors ability to comply with the performance schedule for Steamboat Island HREP- Phase II.

(AR 506) (emphasis added). The CO concluded that Legacy's past schedule performance was unsatisfactory and demonstrated the contractor was not responsible within the meaning of FAR 9.104. (AR 507).

        1.      <u>The CO's determination was neither arbitrary nor capricious.</u>

Legacy insists the CO wrongfully considered information regarding the United States' potential default termination and performance schedule concerns under the ongoing contract. (Pl.'s MJAR at 13). Legacy asserts that this evidence violated the FAR because ultimately: (1) the termination for default was never issued; and (2) the performance schedule concerns were "promptly corrected" resulting in no CPARS report being issued for either concern. (*Id.* at 13–14). Legacy contends that the evidence was prejudicial in that it served as the sole basis for the CO's referral to the SBA, which subsequently relied upon it in its determination to deny Legacy a COC. (*Id.* at 14).

As an initial matter, the standards by which a prospective contractor's responsibility is judged are outlined in FAR 9.104-1. *C&G Excavating, Inc. v. United States*, 32 Fed. Cl. 231, 239 (1994) (citing *Reel–O–Matic Sys., Inc. v. United States*, 16 Cl. Ct. 93, 99 (1989)). "[T]he responsibility criteria set out in FAR 9.104-1 are to be utilized by both procuring agencies and the SBA." *J.E. McAmis, Inc. v. United* States, 164 Fed. Cl. 650, 662 (2023) (citing *CSE Constr. Co.*, 58 Fed. Cl. at 250). To be determined responsible, a contractor must "[b]e able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments." *Sims*, 655 Fed. Appx. at 829 (quoting 48 FAR 9.104-1(b)). On the other hand, FAR 42.1503 outlines procedures agencies must utilize when developing evaluations of a contractor's performance on government contracts. *See Alamo Travel Grp., LP v. United States*, 108 Fed. Cl. 224, 234 (2012)); *see also Maint. Eng'rs v. United States*, 50 Fed. Cl. 399, 423 n.8 (2001). These are two very distinct regulations that Legacy seems to conflate throughout its argument, thus the Court will turn to each of Legacy's claims in turn.

First, Legacy argues consideration of ongoing contract information violates the "spirit and intent of FAR 42.1503(d)" because this provision entitles Legacy to appeal the CO's decision above the CO's legal and not to the SBA." (Pl.'s Reply at 4). That provision provides:

> Agency evaluations of contractor performance . . . shall be provided to the contractor as soon as practicable after completion of the evaluation. The contractor will receive a CPARS-system generated notification when an evaluation is ready for comment. Contractors shall be afforded up to 14 calendar days from the date of notification of availability of the past performance evaluation to submit comments, rebutting statements, or additional information. Agencies shall provide for review at a level above the contracting officer to consider disagreements between the parties regarding the evaluation. The ultimate conclusion on the performance evaluation is a decision of the contracting agency.

FAR 42.1503(d).

When interpreting regulations, the Court applies the same interpretive rules used when analyzing the language of a statute. *Boeing Co. v. Sec'y of Air Force*, 983 F.3d 1321, 1327 (Fed. Cir. 2020) (citing *Mass. Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1365 (Fed. Cir. 2015)). Therefore, the Court must analyze the plain and ordinary meaning of section 42.1503(d). *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."). Importantly, the Court must assess "a [regulatory] scheme in its entirety" and "give full effect to all words contained within [a] statute or regulation, thereby rendering superfluous as little of the statutory or regulatory language as possible." *Hanser v. McDonough*, 56 F.4th 967, 970 (Fed. Cir. 2022) (internal quotations omitted). "If the regulatory language is clear and unambiguous, the inquiry ends with the plain meaning." *Goodman v. Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017). The issue with Legacy's assertions is that it ignores two sentences immediately preceding which state: "Agency evaluations of contractor performance, including both negative and positive evaluations, prepared under this subpart shall be provided to the contractor as soon as practicable *after completion of the evaluation*. The contractor will receive a CPARS-system generated notification when an evaluation is ready for comment." FAR 42.1503(d) (emphasis added).

In context, a contractor is entitled to provide comments to higher authority rebutting a performance evaluation after a performance evaluation has been completed. That is not the scenario here. The CO considered information from an ongoing contract for which no CPARS had been formalized. (AR 623–24). This information was garnered from sources independent of a CPARS evaluation as evidenced from the cure and show cause letters. (AR 509–13). In making responsibility determinations, a CO is authorized to consider information independent of CPARS evaluations to include: "records and experience data, including verifiable knowledge of personnel within the contracting office, audit offices, contract administration offices, and other contracting offices." FAR 9.105-1(c). Further, the FAR requires CO's to "promptly share relevant information" regarding "circumstances casting doubt on a contractor's ability to perform contracts successfully." FAR 9.105-1(d).

Ultimately, because the Agency did not complete a formal CPARS evaluation for the ongoing contract, Legacy's rights to offer comments or rebuttals were not triggered. Nevertheless, use of this information was not only proper but mandated because evidence of a cure and show cause letter on a similar contract casts ███ on Legacy's ability to perform. Therefore, FAR 42.1503 has no bearing on this case.

Second, Legacy asserts it was deprived of its right to challenge a CPARS rating pursuant to FAR 42.1503(f). (Pl.'s MJAR at 16). Legacy seemingly alleges the CO's consideration of the ongoing contract violated FAR 42.1503(f) by "injecting derogatory CPARS" into the COC process, preventing Legacy from offering rebuttals to those CPARS, and failing to consider Legacy's responses to the COC application. (*Id.* at 17). Despite Legacy's acknowledgment that a CPARS had not yet been entered at the time of the CO's responsibility review, (*id.* at 4 ("There was also no CPARS initiated for [the ongoing contract]"), Legacy insists it has a statutory right to challenge the CO's consideration of this issue through "narrati[on] to the SBA." (*Id.* at 16). Pursuant to FAR 42.1503(f), Legacy suggests that a CO is "required to address and consider [a] contractor's responses." (Pl.'s MJAR at 13 (citing *Bender Shipbuilding*, 297 F.3d at 1362)).

FAR 42.1503(f) provides, in relevant part:

> Agencies shall prepare and submit all past performance evaluations electronically in CPARS . . . . These evaluations, including any contractor-submitted information . . . become available for source selection officials not later than 14 days after the date on which the contractor is notified of the evaluation's availability for comment. The Government shall update CPARS with any contractor comments provided after 14 days, as well as any subsequent agency review of comments received.

The plain language of this regulation establishes the method for submitting evaluations, the information to be included, and when they will become available. *Id.* These provisions concern formalized CPARS entries which, as Legacy concedes, had not yet been created for Legacy's performance under the ongoing construction contract. Thus, this regulation is not relevant to Legacy's claims in this scenario.

Legacy also contends that the CO was required to consider Legacy's responses in his responsibility determination. (Pl.'s MJAR at 13 (citing *Bender Shipbuilding*, 297 F.3d at 1362)). It is unclear how Legacy's argument is supported by the cases cited by *Bender Shipbuilding*. *Bender Shipbuilding* highlighted a quote from *Impresa*, stating that "[c]ontracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." 297 F.3d at 1362 (quoting *Impresa*, 238 F.3d at 1334–35 (quoting *John C. Grimberg Co.*, 185 F.3d at 1303)). The *Impresa* Court further held that "[i]n the absence of information clearly indicating" a contractor is responsible, the CO "shall make a determination of responsibility or nonresponsibility," but is not required to explain the basis for his determination. *Impresa*, 238 F.3d at 1334–35 (citing 48 C.F.R. § 9.103(b)).

Additionally, the plaintiff in *Grimberg* argued that USDA acted contrary to law by not requesting additional information from Grimberg and did not provide Grimberg with an

opportunity to respond to concerns regarding its proposed project manager before finding them non-responsible. *John C. Grimberg Co.*, 185 F.3d at 1303. The Federal Circuit rejected that argument, finding that FAR 9.1015-1(a) requires a CO to obtain "enough information to make a responsibility determination" and decisions to "seek additional or clarifying responsibility information" are discretionary. *Id.* (citation omitted). A CO, "as the arbiter of what, and how much, information he needs" may offer a contractor the "opportunity to explain or defend against adverse evidence" but may also make a responsibility determination based on the record without doing so. *Id.*; *See also Bailey Tool & Mfg. Co. v. United States*, 117 Fed. Cl. 457, 465 (2014) (holding COs decide what constitutes sufficient evidence to make their responsibility determinations).

The CO in this case noted that out of fourteen contracts, Legacy received two ███████████ and three ███████ past performance schedule ratings for work similar to the current solicitation. (AR 505). These ███████████ are not inconsequential. The CO reviewed detailed CPARS reports explaining the bases for each of Legacy's evaluations. (AR 526–618). Additionally, the CO considered Legacy's schedule performance under an ongoing contract, noting the United States issued a cure notice and a show cause letter. (AR 509–13). While the CO did not solicit a response from Legacy regarding the schedule concerns in the ongoing contract, he did review and consider Legacy's response to the cure notice in which Legacy provided detailed explanations for each of the United States' concerns on this contract. (AR 514–18).

Based on these findings, the CO retained discretion to determine that this amount of information "was sufficient to make the ultimate decision of nonresponsibility." *See John C. Grimberg Co.*, 185 F.3d at 1303. The Court will not substitute its own judgment for that of the agency in this regard. *Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1359 (2015). The CO was well within his discretion to determine that this information was sufficient to make a non-responsibility determination and Legacy was not entitled to offer additional responses.

Third, Legacy contends that the CO's consideration of a performance period between July 28, 2016 and February 8, 2017 contravened FAR 42.1503(g) "because it was in excess of 6 years." (Pl.'s MJAR at 25). The unequivocal language of the FAR provides otherwise. "Agencies shall use the past performance information in CPARS that is within three years (six for construction and architect-engineer contracts) of the completion of performance of the evaluated contract or order." FAR 42.1503(g). Relying on the plain language of the statute, "the rule *requires procuring agencies* to use past performance information in the [CPARS] if it relates to a contract where performance was completed within the last [six] years." *BLR Grp. of Am., Inc. v. United States*, 94 Fed. Cl. 354, 363 (2010), *appeal dismissed*, 460 Fed. Appx. 918 (Fed. Cir. 2011) (analyzing language identical to FAR 42.1503(g)) (emphasis added). Accordingly, an agency may consider past performance for up to six years after the completion of contract performance as a whole, rather than for only six years after each incident of performance under the contract. The contract in question began on July 28, 2016, and concluded on June 24, 2020. (AR 1619). Under FAR 42.1503(g), the CO was permitted to consider any reports generated throughout the contract's performance and up until June 25, 2026. Because the six-year limitations period had not yet expired, the CO permissibly considered Legacy's interim reports occurring between July 2016 and February 2017.

Turning to FAR 49.4, Legacy argues that the CO "is bound to follow its own [termination for default] rules, and the failure to follow them cannot be explained away by post-hoc rationalizations." (Pl.'s Reply at 8). FAR 49.4 establishes the procedures, rights, and obligations of parties once an agency has officially entered a termination for default. *See generally* FAR 49.4. Since a termination for default was never issued in this case, this regulation has no bearing and the Court declines to assess it further.

When a CO rejects a bidder as non-responsible due to a small business concern, "the contracting officer shall refer the matter to the [SBA]" who decides whether to issue a COC. FAR 9.104-3(d)(1); *see also Legacy Corp. of Illinois v. United States*, 172 Fed. Cl. 314, 316–17 (2024). The SBA is not bound to solely consider the information "that formed the basis of the contracting officer's decision[,]" but may consider "all aspects of responsibility that it considers germane." *Stapp Towing*, 34 Fed. Cl. at 307. Furthermore, upon referral to the SBA, the agency "is required to submit '[a]ny justification and documentation used to arrive at its responsibility determination.'" *CSE Constr. Co.*, 58 Fed. Cl. at 254 (citing 13 C.F.R. § 125.5(c)(1)(vii)).



PHOTO OF RESTORATION PROJECT

Since the CO determined that Legacy was non-responsible, he was required to provide the SBA with all evidence that supported his decision. C.F.R. § 125.5(c)(1)(vii). The Court has determined that the CO properly considered Legacy's performance from its ongoing contract and the interim reports reaching beyond six years, thus the SBA owed the same level of consideration. Therefore, Legacy's argument that the SBA improperly considered the previously discussed factors is necessarily precluded.[7]

### 2.    The CO did not act in bad faith.

Legacy alleges that the CO's and SBA's treatment of Legacy and the awardee was unequal. (Pl.'s MJAR at 26). Legacy insists that it was treated differently because USACE "focused on [Legacy's] past performance from over 6 years" but assessed the awardee on "price and price-related factors." (*Id.*). Legacy also claims unequal treatment due to consideration of the potential termination for default.[8] (*Id.* at 30). Legacy seems to argue that the CO "gave credit"

---

[7] Photo of Restoration Project. Zlatan Hrvacevic, *Steamboat Island Restoration Project*, DredgingToday.com (Oct. 29, 2024), https://www.dredgingtoday.com/2024/10/29/steamboat-island-restoration-project/.

[8] Because the Court has dismissed this underlying argument, it will not address it further.

for the awardee's ability to improve and address performance concerns from past CPARS but "discredited" evidence of Legacy's performance improvements. (Pl.'s Reply at 14). Legacy further argues the record demonstrates bad faith because Legacy was not permitted to respond to the CO's final version of his non-responsibility determination. (Pl.'s MJAR at 19).

The United States argues that the CPARS reports for each offeror reflect "distinguishable differences that justify different treatment." (Def.'s Reply at 8). The United States first highlights that Legacy received two ███████ ratings within its past performance whereas awardee Newt Marine received none. (*Id.*). Next, the United States notes that even though Newt Marine received ███████ ratings on past performance they "were for work on which the scope was different from the work on this contract." (*Id.*). The United States asserts that the improvements identified by Legacy, and credited by the CO, were "reflected in ratings that went from satisfactory to very good." (*Id.* at 9). Last, the United States argues that even though Legacy only responded to a draft version of the non-responsibility determination, the Legacy overstates the differences contained in either version. (Def.'s xMJAR at 29).

### i. Unequal Treatment

The solicitation provided evaluations would be based solely on price factors pursuant to FAR 52.214-19(a) which provides: "The Government will evaluate bids in response to this solicitation without discussions and will award a contract to the *responsible bidder* whose bid, conforming to the solicitation, will be most advantageous to the Government, considering only *price* and the *price-related* factors specified elsewhere in the solicitation." (AR 52 (emphasis added)). Under these terms, the United States selected Legacy because its bid reflected the lowest price for the work required. (AR 494–95). However, under the solicitation's terms, the award would be contingent on the offeror also being deemed "responsible." (AR 52). To make the responsibility determination, the CO conducted a responsibility review pursuant FAR 9.104-1 and ultimately determined Legacy to be non-responsible due to past performance concerns on previous contracts. (AR 505–08); *see CRC Marine Serv., Inc. v. United States*, 41 Fed. Cl. 66, 83 (1998) (holding a contractor is not entitled to an award simply by being the lowest bidder, they must also prove their capability to perform the contract).

Once the SBA declined to issue Legacy a COC, (AR 1632), the CO selected Newt Marine's bid for review as the next lowest-priced submission for the required work. (*See* AR 42; 1633–35). Newt Marine subsequently underwent a responsibility review where the CO scrutinized its past performance. (AR 1636–39). This process was identical to the evaluation of Legacy and there are no indications of unequal treatment.

To the extent that Legacy argues the CO unequally weighed performance indicators during his responsibility review for each offeror, the Court finds that this argument is unsupported. The CO reviewed the offerors' CPARS and several notable differences validate the CO's reasoning. First, the CO reviewed formalized CPARS, noting that Legacy received two ███████ and three ███████ ratings in the schedule category, (AR 623–24), compared to Newt Marine's four ███████ ratings, (AR 1637). The CO further identified that Legacy's ███████ and ███████ ratings, along with performance concerns from the ongoing contract, all stemmed from "work similar to [this contract,]" (AR 623–24). In contrast, the Awardee's ███████ ratings stemmed from dissimilar work and "only constituted █% of [Awardees'] overall

rating history." (AR 1637). The key distinction between the CO's findings is that a review of Legacy's performance exhibits both "deficiencies and a pattern of noncompliance" while the Awardee's deficiencies seem to reflect only "minor, isolated incidents of noncompliance." *Ettefaq-Meliat-Hai-Afghan Consulting, Inc. v. United States*, 106 Fed. Cl. 429, 438 (2012).

Legacy's assertion that the CO did not credit its improvements on previous contract evaluations is factually inconsistent with the record. The CO noted several instances in which Legacy successfully raised its ratings, but also highlighted that these deficiencies "reduce[d] the amount of task orders the Government [could] complete, therefore limiting the dredging work." (AR 624–25). Even if the CO were to place more emphasis on Legacy's improvements as Legacy seems to insist, previous failures and similar ongoing issues justified the CO's decision to find Legacy non-responsible based on his "business judgment." *MG Altus Apache Co. v. United States*, 111 Fed. Cl. 425, 451 (2013). Therefore, the CO's decision was reasonable.

### ii.    Multiple Versions of the CO's Determination of Non-Responsibility

When referring a contractor to the SBA due to a finding of non-responsibility, 13 C.F.R. § 125.5(c)(1)(v) mandates that the CO include a "written determination of nonresponsibility" to their referral for the SBA's review. The plain language of the statute is clear. *See CSE Constr. Co.*, 58 Fed. Cl. at 254 (finding no ambiguity in the language of 13 C.F.R. § 125.5(c)(1)(2001)).

The record contains two versions of the CO's written determination of non-responsibility. (*Compare* AR 623, *with* AR 1200). The CO provided the SBA with a memorandum dated January 30, 2024 ("final version"), (AR 623–26), as part of the COC referral packet pursuant to 13 C.F.R. § 125.5(c)(1). When the SBA notified Legacy of the CO's referral, it included a second memorandum by the CO dated January 29, 2024 ("draft version"), (AR 1200–03). Notably, the AR does not demonstrate how the SBA obtained this draft version, nor is there evidence of when the CO provided the SBA with the draft version. (*See generally* AR).

The United States attached two declarations to its Cross-Motion.[9] (Def.'s xMJAR, ECF No. 33). During Oral Argument, the United States stated these declarations were attached to explain "procedural irregularity . . . in compiling the administrative record[,]" which resulted in the AR containing two versions of the CO's non-responsibility determination. (OA Tr. 10:15–25, ECF No. 52). Despite attachment of these declarations at the briefing stage, the declarations are not a part of the administrative record.

The focal point for judicial review is the agency's administrative record, thus "the standard for discovery in the bid protest is narrower," than in non-bid protest cases. *Proxtronics Dosimetry, LLC v. United States*, 128 Fed. Cl. 656, 681 (2016); *see also Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000) ("[E]xceptions to the general rule against extra-record evidence is based upon necessity, rather than convenience, and should be triggered only where

---

[9] The declarations consisted of written statements from the CO (Ryan Larrison) managing this solicitation and the attorney from the SBA's Office of General Counsel (Lane Siems) who compiled the administrative record.

the omission of extra-record evidence precludes effective judicial review."), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005). The purpose of limiting review to the record before the procuring agency is to prevent courts from using new evidence to "convert the 'arbitrary and capricious' standard into effectively *de novo* review." *Murakami*, 46 Fed. Cl. at 735. The ability to submit additional information into an administrative record is therefore limited. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

There are two vehicles for submitting additional information to an administrative record: a motion to complete and a motion to supplement. A motion to complete the record seeks to add documents that were considered by the agency and relevant to the challenged decision. *See BHB Ltd. P'ship v. United States*, 147 Fed. Cl. 226, 229 (2020). However, the government's designation of the administrative record is presumptively complete. *Poplar Point RBBR, LLC v. United States*, 145 Fed. Cl. 489, 494 (2019) (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)). To rebut this presumption, this Court has required "clear evidence of material that was generated or considered by the agency but excluded from the record[.]" *BHB Ltd. P'ship*, 147 Fed. Cl. at 229 (citing *Poplar Point*, 145 Fed. Cl. at 494); *see also Linc Gov't Servs., LLC v. United States*, 95 Fed. Cl. 155, 158 (2010).

Conversely, the Court must grant a request to supplement the administrative record or conduct discovery in a bid protest only "if necessary for effective judicial review or if the existing record cannot be trusted." *Diversified Maint. Sys. v. United States*, 93 Fed. Cl. 794, 802 (2010) (internal quotations omitted); *cf. Axiom Res. Mgmt.*, 564 F.3d at 1381. Only in extremely limited circumstances is supplementation of the administrative record appropriate, such as where the agency failed to consider relevant factors or where there is some evidence of bad faith or improper behavior by agency officials. *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 342 (1997)); *see also Axiom*, 564 F.3d at 1379 (citing *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997)). This Court is limited to supplementing the record in instances in which it can "explain why the evidence omitted from the record frustrated judicial review as to the ultimate question of whether [the agency action] was arbitrary and capricious." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom*, 564 F.3d at 1379–80).

Regarding these declarations, the United States has neither filed a motion to complete the record nor requested the Court supplement the record. (*See generally* Def.'s xMJAR; *see also* Def.'s Reply). By virtue of the substance of the documents, they were not considered before the agency and thus are not relevant to this procurement. Additionally, when questioned, the United States rejected the notion that the Court was incapable of properly adjudicating this case absent the declarations. (OA Tr. 8:21–9:3 (responding to the Courts direct inquiry "is the United States conceding that the administrative record is insufficient for the Court to conduct a meaningful review?")). Because the Court agrees that these documents do not aid in judicial review, inclusion of the declarations would be inappropriate. Therefore, the Clerk is **ORDERED** to **STRIKE** Exhibits 1 and 2 which are attached to the United States' Cross Motion and Response, (ECF No. 33).

Nonetheless, Legacy seemingly continues to find a comparison of the two documents relevant as some evidence of inconsistency between the CO's and SBA's decision, stating:

> Contrary to the Defendant's arguments, the record does not overstate the differences between the two version of the agency's non-responsibility determination. . . [f]irst, the government notes several ██████████ ratings and suggests that future problems may occur and this is why Plaintiff is deemed non-responsible. However new tab 19 – which is extremely important to Plaintiff's response, shows that the contracting officer admitted that any problems with schedules could be overcome. However, the SBA COC decision states that Plaintiff cannot overcome the contracting officer's concerns.
>
> The contracting officer also ignored the fact that Plaintiff was open and transparent about its previous equipment issues and subsequent corrections.

(*Id.* at 13). The record does not support Legacy's claims.

Legacy points to language in the CO's draft version that expressed an opinion regarding Legacy's ability to overcome schedule performance issues. The CO stated:

> Upon a review of Legacy schedule performance, results were mixed as seen in the chart below. Several ██████████ ratings were noted in the schedule category. Based on this information, problems with schedules *can be overcome* by Legacy Corporation but will require additional Government oversight to maintain schedule and quality on a weekly basis. This is a concern, and the reason why, I consider them non-responsible.

(AR 1200) (emphasis added). Legacy asserts this contradicts the SBA's COC Committee's decision, which stated: "[b]ased upon the applicant's explanations and its corrective plan and actions, the Committee concluded that the applicant failed to overcome the reasons cited in the Determination of Non-Responsibility." (AR 1627) (emphasis added). Legacy seems to argue that differences between the two versions of the CO's non-responsibility determination have some bearing on a comparison between the CO's and the SBA's determinations. The Court does not find such correlation.

First, both the draft and final versions identify that Legacy had ██████████ ratings within its performance history. (*Compare* AR 505 ("there are several ██████████ ratings, as well as ██████ ratings, noted in the schedule category[.]"), *with* AR 1200 ("Several ██████████ ratings were noted in the schedule category.")). While the draft version differs from the final version in that it states Legacy can overcome schedule issues, the CO explicitly conditioned this capability as requiring "additional Government oversight[,]" suggesting a greater level of governmental supervision. (AR 1200). Contrary to what Legacy would attempt to lead this Court to believe, this was not a blanket statement of Legacy's ability to rise to the occasion.

Second, both the draft and final versions note Legacy's previous equipment failures. (*See* AR 625–26 ("they have a performance history of their equipment breaking down . . . Legacy stated they had several equipment failures"); *see also* AR 1202 ("Legacy has strict timeframes . . . and equipment breakdowns made it difficult to fulfill the Government schedule

requirements.")). Notably, the CO's draft version specifically highlights Legacy's responses to both the cure and show cause notice in which Legacy offered various justifications to explain its equipment failures:

> A cure notice was issued to Legacy on 24 August 2023 for unacceptable delays in completing the task order performance . . . [a] response to the cure notice was received by the Government . . . [t]he response detailed numerous equipment failures that impeded the performance of the task order and refuted the Government's claim it was negligent and the contractor's fault. The response also detailed corrective actions taken to include implementing a 24 hour/day and 7 day/week schedule for the dredge crew and ensuring a full and operational maintenance staff . . . [a] response to the show cause notice was received . . . detail[ing] the continued issues experienced with equipment failures and difficulty in dealing with the type of dredged material.

(AR 1202). While the final version did not provide the same depth of analysis regarding Legacy's equipment failures, the similarities contravene Legacy's assertion. The draft version acknowledges Legacy's transparency regarding its equipment issues and the CO utilized that transparency to form his responsibility determination.

Even if this Court were to determine that the CO ignored contextual information regarding Legacy's equipment failures, this would not indicate prejudice. The SBA was ultimately the final decision maker and "Legacy had the chance" to address its concerns regarding these issues within its COC application. (AR 1248–56); *see also Legacy Corp. of Illinois*, 172 Fed. Cl. at 317 (citing 13 C.F.R. § 125.5 (providing SBA independent authority and discretion to evaluate all elements of responsibility)). While the existence of both a draft and final version may inspire the Agency to reexamine its internal submission processes and cause the SBA to read their emails more closely, there is no evidence that these errors prejudiced Legacy.[10]

Lastly, the final version does refer to unfavorable information contained in past CPARS that is not also found within the draft version.[11] (*Compare* AR 507, *with* AR 1200–1203). While Legacy may not have been aware that the final version included this specific information,

---

[10] If a practice exists in which agencies forward draft versions of documents to the SBA for its review and potential comments, without disclosure to a bidder challenging a responsibility determination, that practice would be, to put it mildly, problematic. In this instance, however, the draft and final versions of the CO's determination are sufficiently alike to determine that Legacy suffered no prejudice. In addition, the administrative record contained both versions, thus permitting effective judicial review.

[11] The final version highlights Legacy received ███████ ratings on contract no. W912ES21D0002 and was "assessed for liquidated damages" and issued a "Letter of Concern" under contract no. W912EK21D0003. These references do not appear in the CO's draft version of the non-responsibility determination.

Legacy should have been aware that these reports existed as they would have been provided during performance on its previous contracts. The SBA's authority extends to all areas of responsibility; thus, it would be unreasonable for Legacy to believe that this prior performance information would be overlooked. 13 C.F.R. § 125.5(f)(1). To the extent that Legacy alleges due process violations, the record establishes Legacy's awareness of USACE's complaints and referral to the SBA, and that Legacy was provided with an opportunity to respond to the SBA with its position regarding those complaints; Legacy was not entitled to anything more in the way of due process. *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 610 (1974) ("[d]ue process of law guarantees 'no particular form of procedure; it protects substantial rights.'"); *see also Cook v. United States*, 210 Ct. Cl. 368, 373 (1976). Therefore, Legacy's claims are unsupported by the record.

       B.      *The SBA's decision to not issue a COC was neither arbitrary nor capricious.*

Legacy asserts several claims regarding the SBA's alleged failure to adequately consider sufficient information to reach its COC determination. (Pl.'s Reply at 6). Legacy concedes that the SBA's Area Review Committee Chairperson and COC Program Manager "thoroughly analyz[ed]" all relevant evidence but argues that the final Committee neglected to do so because "the [Committee] only produced a two-page document showing that the Committee voted not to issue a [COC]." (*Id.*). Legacy insists that this necessarily demonstrates a lack of "meaningful review and contemporaneous documentation." (*Id.* at 6). Legacy argues the SBA failed to meaningfully investigate because it did not consider any of Legacy's corrective actions. (*Id.* at 10–11; *see also* Pl.'s MJAR at 29, 35).

The Court will generally not take issue with the SBA's process unless the plaintiff evinces that the SBA "deviated from its standard operating procedure[s] or . . . deprived plaintiff of the right to submit pertinent information and explain its case for a COC." *See PNM Constr., Inc. v. United States*, 13 Cl. Ct. 745, 750 (1987) (finding the committee's use of a vote to make its final recommendation permissible). Here, Legacy has demonstrated neither.

The Committee reviewed and summarized the factors considered in its recommendation, including (1) the basis for the CO's referral, (2) Legacy's responses to the COC application, and (3) the IS's report. (AR 1626–27). The Committee was comprised of three members, who by majority vote ultimately recommended to deny Legacy a COC, holding:

> By a simple majority, the Committee recommended not to issue a COC based on the firm not sufficiently overcoming the CO's objections.

> Based upon the applicant's explanations and its corrective plan and actions, the Committee concluded that the applicant failed to overcome the reasons cited in the Determination of Non-Responsibility. As a result, it recommended that SBA decline to issue a Certificate of Competency.

(AR 1627).

As Legacy concedes, the IS's report was thorough and well-reasoned; Legacy's response to the CO's non-responsibility determination was also in-depth, and the SBA had access to concerns raised by the CO. (Pl.'s Reply at 6; *see also* (AR 623–26, 1248–56, 1618–25). These

factors together demonstrate a well-rounded source of information for the SBA to make its determination. *See United Enter.*, 70 Fed. Cl. at 31 (citing *Advanced Data Concepts, Inc v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (holding the court will sustain agency decisions evincing rational reasoning and consideration of relevant factors)).

Upon receiving the referral for non-responsibility from the CO, SBA notified Legacy and sought a response to the CO's findings and ultimate determination of non-responsibility. (AR 1197–1222). Legacy's detailed response provided its perspective as to why it believed a non-responsibility determination was improper and included what it believed to be supporting evidence. (AR 1235– 1376). The SBA assigned the case to the IS who compiled all of the information into a report and ultimately recommended Legacy receive COC. (AR 1618–25). After reviewing all information within the IS's report, the Committee cast a vote rejecting the IS's recommendation. (AR 1626). The Court finds the SBA's ruling to be "eminently rational and reasonable" considering the amount of information reviewed within the IS's investigation. *PNM Constr.*, 13 Cl. Ct. at 750. The record does not suggest the COC Committee failed to meaningfully reach its final recommendation.

While Legacy may be dissatisfied by the lack of depth in the final summary, the Court cannot imply consideration to mean a detailed explanation. *Stapp Towing*, 34 Fed. Cl. at 308 (characterizing the SBA's final memorandum and meeting summary as not the "ideal manifestation of cogency" for judicial review). "It is well-established that 'an agency official exercising discretion need not address every piece of evidence presented in its decision.'" *Ocean Ships, Inc. v United States*, 115 Fed. Cl. 577, 593 (2014) (quoting *Preferred Sys. Sol., Inc. v. United States*, 110 Fed. Cl. 48, 59 (2013)); *see also Rebosky v. United States*, 60 Fed. Cl. 305, 312 (2004). The Committee's failure to discuss all evidence does not mean it was not considered nor does it demonstrate an incomplete explanation. *Preferred Sys.*, 110 Fed. Cl. at 59. Thus, the fact that the Committee's summary consisted of only two pages does not by itself establish that a decision was reached without thoughtful consideration of all factors.

Legacy argues that the Committee did not account for Legacy's corrective actions to mitigate schedule and equipment failures on other contracts. (Pl.'s Reply at 10–11). The SBA must conduct an adequate investigation "into elements of responsibility which it purports to evaluate[;]" thus, a failure to consider Legacy's corrective actions may violate the SBA's obligations. *CSE Constr. Co.*, 58 Fed. Cl. at 257–58. However, as the United States properly analyzed, evidence of Legacy's corrective actions would not require the SBA to make a finding of responsibility. *See Stapp Towing*, 34 Fed. Cl. at 309–10 (upholding the SBA's finding of non-responsibility despite evidence of plaintiff's corrective actions). With this understanding, the Court now reviews the Committee's findings.

In its meeting summary, the COC Committee made several acknowledgements of Legacy's corrective actions:

> The applicant explained that while they did face schedule issues on a prior contract that was mentioned in the Interim CPARS Report, the *issues were due to unforeseen equipment failures that were remedied as quickly as possible*. In addition, the applicant *shifted operations to 24/7 hours* for that

contract effort to recover from the schedule slippage. The applicant also stated . . . there have been no issues since.

(AR 1626) (emphasis added). "The applicant also emphasized that despite the Unacceptable ratings on the Interim reports, the final Schedule rating for this contract was Acceptable and the rating official stated that they 'would recommend this firm for similar projects in the future.'" (AR 1627).

Additionally, the Committee highlights the IS's report which also addressed Legacy's corrective actions:

The IS Report stated "I sense that Legacy Corp *is taking remedial actions* to shore up their management and quality issues and in fact have successfully completed similar actions for the federal government. Schedule slippage was discussed at length and it is my opinion *they are taking action* to address this internally.

(AR 1627) (emphasis added). Even if briefly discussed, the record clearly shows the COC Review Committee did in fact consider the corrective actions that Legacy insists were ignored. Ultimately, the SBA decides whether a contractor has overcome the CO's objections in a responsibility determination; here, they found Legacy had not. Therefore, Legacy's final argument fails.

### III.    Conclusion

For the reasons stated above, Legacy's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 29), is **DENIED**. The United States' and Newt Marine Service's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 33; Int.-Def.'s xMJAR, ECF No. 32), are **GRANTED**.

The Court **GRANTS** the United States' Motion to Amend/Correct the Administrative Record, (ECF No. 37).

The Clerk is **ORDERED** to **STRIKE** Exhibits 1 and 2 which are attached to the United States' Cross Motion and Response, (ECF No. 33).

Further, the Court **DENIES** the United States Motion for Extension of Time to File Motion for Judgment on the Administrative Record as **MOOT**, (ECF No. 31).

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this memorandum opinion within fourteen (14) days of its entry to allow the Court to file a public version of the opinion.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge